UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **GWENDOLYN A. ATKINS** | * | |
| | * | |
| **VERSUS** | * | |
| | * | **CIVIL ACTION NO: 11-00047-RLB** |
| **SOUTHEAST COMMUNITY** | * | |
| **HEALTH SYSTEMS** | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

### MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

**NOW INTO COURT,** through undersigned counsel, comes defendant, Southeast Community Health Systems ("SCHS"), who respectfully submits this *Memorandum in Support of Motion for Summary Judgment*.

**I.     INTRODUCTION**

SCHS, a federally qualified health center ("FQHC"), is a nonprofit organization providing health care to individuals in underserved communities regardless of ability to pay. During her employment with SCHS, plaintiff Gwen Atkins ("Ms. Atkins") was tasked, for a period of time, with assisting with data entry and other administrative functions associated with the Prescription Assistance Program ("PAP"), a program by which drug companies supply medication free of charge to qualifying patients who meet income criteria. Ms. Atkins, however, abused her access to and knowledge of the PAP, ultimately somehow obtaining shipped prescriptions for Viagra for several of her friends and family members. After investigation revealed that Ms. Atkins had repeatedly obtained such prescriptions for various individuals despite there being no evidence of any visit or prescription in the patient's chart, she was terminated. At the time of her termination, Ms. Atkins had a Charge of Discrimination pending

with the EEOC for over a year. On this thin basis, she brings a claim of Title VII retaliation in her termination. For the reasons below, Ms. Atkins presents no genuine issue of material fact, and her claims are due to be dismissed.

## II.    FACTS

SCHS is a federal qualified health center ("FQHC"), a nonprofit organization.[1] SCHS provides medical care to patients regardless of insurance or ability to pay.[2] Ms. Atkins was first employed by SCHS as a custodian/driver in 1996.[3] She became a receptionist for SCHS in 1999 at the Greensburg clinic, the only SCHS location at the time.[4] As receptionist, Ms. Atkins worked at the front desk and greeted patients.[5]

In approximately 2007, SCHS Finance Director Patty Wall sent Ms. Atkins to training for online access to the Patient Assistance Program ("PAP").[6] After that time, Ms. Atkins states that her job duties expanded to include ordering patient medication from the PAP via its online portal.[7] The PAP website was utilized by SCHS to request free medication for patients who met certain income criteria.[8]

On March 14, 2008, SCHS's Executive Director at the time, Linda Beauvais ("Ms. Beauvais"), terminated Ms. Atkins' employment with SCHS.[9] In the termination notice, Ms. Beauvais stated that Ms. Atkins was being dismissed "for using the company's [PAP] for your personal prescriptions when you have insurance coverage."[10] Ms. Beauvais further stated that

---

[1] Ex. 1, *Atkins Depo.*, p. 19.
[2] Ex. 1, *Atkins Depo.*, pp. 19-20.
[3] Ex. 1, *Atkins Depo.*, p. 15.
[4] Ex. 1, *Atkins Depo.*, pp. 16-17.
[5] Ex. 1, *Atkins Depo.*, p. 18.
[6] Ex. 1, *Atkins Depo.*, pp. 18-19.
[7] Ex. 1, *Atkins Depo.*, pp. 18,
[8] Ex. 2, *LeBlanc Depo.*, pp. 59-60.
[9] Ex. 1, *Atkins Depo.*, p. 37 & Exhibit 3 thereto.
[10] Ex. 1, *Atkins Depo.*, Ex. 3.

Ms. Atkins had "been written up and counseled for this very same violation in the past."[11] She attached a May 8, 2003, Memorandum to Ms. Atkins from Ms. Beauvais, requiring that Ms. Atkins repay SCHS for amounts improperly paid on her behalf by SCHS for the PAP.[12] Ms. Atkins acknowledges receipt of both documents, though she claims they both reference the 2008 event and that she received them both at the time of her 2008 discharge.[13]

Following her 2008 discharge, Ms. Atkins filed a Charge of Discrimination with the EEOC.[14] She additionally met with members of the Board of Directors at SCHS, at her request, to discuss her termination, her dissatisfaction with her pay rate, and her complaints of discrimination.[15]

In or around May of 2008, SCHS agreed to reinstate Ms. Atkins to her employment.[16] As part of the terms of her reinstatement, Ms. Atkins was provided back pay from the date of her dismissal until the date of her reinstatement, a raise in pay, and a pledge to further review her pay rate upon her return.[17] Ms. Atkins also received lump sum back pay of approximately $2 per hour for a prior period of time which she estimates to be a year.[18]

When Ms. Atkins returned to work, she resumed her duties with the PAP online.[19] Within a short while, she also again became dissatisfied with her pay. On November 7, 2008, Jacob Johnson ("Mr. Johnson"), the African-American then-Executive Director of SCHS, sent a memo to all SCHS employees requesting information.[20] The memo specifically asked employees

---

[11] Ex. 1, *Atkins Depo.,* Ex. 3.
[12] Ex. 1, *Atkins Depo.,* pp. 33, 37-38 & Exhibit 2 thereto.
[13] Ex. 1, *Atkins Depo.,* pp. 33, 37-38, 41.
[14] Ex. 1, *Atkins Depo.,* pp. 48-49.
[15] Ex. 1, *Atkins Depo.,* pp. 45-46, 48-49 & Exhibit 5 thereto.
[16] Ex. 1, *Atkins Depo.,* pp. 45-46 & Exhibit 5 thereto.
[17] Ex. 1, *Atkins Depo.,* pp. 45-46, 47-48, 49-50 & Exhibits 5 & 6 thereto.
[18] Ex. 1, *Atkins Depo.,* pp. 48-49.
[19] Ex. 1, *Atkins Depo.,* p. 51.
[20] Ex. 1, *Atkins Depo.,* pp. 58, 59, 60 & Exhibit 8 thereto.

whether they felt they had a pay disparity.[21] Ms. Atkins replied that she did, and forwarded the memo back to Mr. Johnson.[22]

Also sometime after her return, either between May 2008 and January 2009 or after January 2009, Ms. Atkins submitted another complaint of discrimination in pay to the EEOC.[23] The complaint was stamped "received" by SCHS on January 12, 2009, and placed in Ms. Atkins' personnel file.[24] Ms. Atkins confirms that, following her complaint to Mr. Johnson and her submission to the EEOC, she received a 3% raise, in approximately March of 2009.[25] She additionally confirms that SCHS was aware of her Charge at least by July 14, 2009, and was likely aware of the Charge as early as January 2009.[26]

On November 30, 2009, Ms. Atkins was transferred away from the Greensburg rural clinic to the Greensburg school-based clinic.[27] By then, SCHS's Chief Executive Officer ("CEO") was Yakima Black ("Ms. Black"), also African-American, who made the decision to transfer Ms. Atkins.[28] The transfer did not result in any adverse changes to Ms. Atkins' pay or benefits.[29] The school-based clinic's only patients were students.[30] Ms. Atkins purports that she was asked to continue to perform PAP functions after relocating to the school-based clinic, despite no longer having access to the online portal and despite no longer being at the clinic where the medications would be shipped.[31]

Ms. Black was separated from employment as CEO in January of 2010, and Selina

---

[21] Ex. 1, *Atkins Depo.,* p. 60 & Exhibit 8 thereto.
[22] Ex. 1, *Atkins Depo.,* p. 60 & Exhibit 8 thereto.
[23] Ex. 1, *Atkins Depo.,* pp. 57, 58 & Exhibit 7 thereto.
[24] Ex. 1, *Atkins Depo.,* Exhibit 7.
[25] Ex. 1, *Atkins Depo.,* p. 61.
[26] Ex. 1, *Atkins Depo.,* p. 109.
[27] Ex. 1, *Atkins Depo.,* p. 83.
[28] Ex. 1, *Atkins Depo.,* p. 84.
[29] Ex. 2, *LeBlanc Depo.,* pp. 58-59.
[30] Ex. 1, *Atkins Depo.,* p. 85.
[31] Ex. 1, *Atkins Depo.,* pp. 85, 88.

4

Senegal ("Ms. Senegal") was appointed Acting CEO.[32] Ms. Senegal is also African-American.[33] Shortly after Ms. Senegal became Acting CEO, she assigned Sheri' LeBlanc ("Ms. LeBlanc"), a recent hire, to perform Human Resources functions.[34]

On May 12, 2010, Ms. LeBlanc signed for a FedEx package at the Greensburg location.[35] The package was addressed to Dr. Carlton Faller ("Dr. Faller"), a physician who was no longer employed at SCHS.[36] Ms. LeBlanc opened the package, and found it contained a bottle of prescription medication – specifically, Viagra – ostensibly for a patient named Lionel Porter ("Mr. Porter"). [37]

At the time she opened the package in May 2010, Ms. LeBlanc had been employed by SCHS for approximately four months.[38] She had not, however, ever had the opportunity to meet Dr. Faller, as Dr. Faller had been separated from employment, and had been on medical leave for a number of weeks prior to his separation.[39] Further, Dr. Faller had always worked exclusively at the SCHS location in Kentwood, and never worked at the Greensburg clinic.[40] The Kentwood clinic had formerly belonged to Dr. Faller, who had sold it to SCHS and continued to work there as an employee.[41] Ms. LeBlanc did not understand why medication purporting to have been prescribed by Dr. Faller would be shipped to the Greensburg clinic at any time, but certainly not after his employment altogether. She therefore contacted Ms. Senegal,[42] and then undertook an

---

[32] Ex. 2, *LeBlanc Depo.,* pp. 10-11.
[33] Ex. 1, *Atkins Depo.,* p. 110.
[34] Ex. 2, *LeBlanc Depo.,* pp. 10-11.
[35] Ex. 2, *LeBlanc Depo.,* pp. 9, 12.
[36] Ex. 2, *LeBlanc Depo.,* pp. 9, 50-51 & Exhibit 5 thereto.
[37] *Id.*
[38] Ex. 2, *LeBlanc Depo.,* pp. 10-11.
[39] Ex. 2, *LeBlanc Depo.,* pp. 9, 53.
[40] Ex. 2, *LeBlanc Depo.,* p. 53.
[41] *Id.*
[42] Ex. 2, *LeBlanc Depo.,* p. 13.

investigation to determine the origin of the medication.[43]

Ms. LeBlanc researched the patient information for Mr. Porter.[44] She and other SCHS employees discovered that there was no record in Mr. Porter's chart of a current prescription for Viagra to support the shipment of the medication, nor had he recently been seen for issues associated with the same.[45] With the assistance of the SCHS IT representative, Ms. LeBlanc logged on to the PAP website under Ms. Atkins' log-in information.[46] She then compared the prescriptions entered by Ms. Atkins, and/or using her log-in data, and determined that Ms. Atkins had repeatedly entered information into the website for alleged prescriptions for which no support was found in the record.[47]

Ms. LeBlanc further reviewed the Greensburg medication logs, wherein PAP medication was logged into the clinic when shipped and logged out of the clinic when picked up a patient or by another person on the patient's behalf.[48] She discovered that on many occasions, Ms. Atkins had picked up prescriptions herself on behalf of the same patients for whom she had entered unsupported prescription data in the PAP website.[49] On almost every recorded occasion, Ms. Atkins specifically picked up the medication Viagra for several different individuals.[50]

Johnny Flowers ("Mr. Flowers") is the father of Ms. Atkins' son.[51] Mr. Flowers lived with Ms. Atkins at her home at 67 Ard Road from approximately 1990 until approximately 2001.[52] Ms. Atkins picked up Viagra for Mr. Flowers on several occasions between December

---

[43] Ex. 2, *LeBlanc Depo.,* p. 15.
[44] Ex. 2, *LeBlanc Depo.,* p. 15.
[45] Ex. 2, *LeBlanc Depo.,* pp. 15, 16.
[46] Ex. 2, *LeBlanc Depo.*, p. 15.
[47] Ex. 2, *LeBlanc Depo.,* pp. 15, 16.
[48] Ex. 2, *LeBlanc Depo.,* pp. 65-66 & Exhibit 11 thereto.
[49] Ex. 2, *LeBlanc Depo,* pp. 67-70.
[50] Ex. 2, *LeBlanc Depo.,* pp. 67-70.
[51] Ex. 1, *Atkins Depo.*, pp. 9-10.
[52] Ex. 1, *Atkins Depo.,* pp. 10-11.

2009 – after she left the Greensburg clinic – and May 2010.[53] Supporting prescriptions were not found in his medical chart.[54]

Leroy Ard ("Uncle Leroy") is Ms. Atkins' uncle.[55] Although Uncle Leroy has a different address than Ms. Atkins, Ms. Atkins entered his mailing address in the PAP website as 67 Ard Road, her own address.[56] She states this was a mistake.[57] This "mistake" meant that letters notifying her uncle of the shipment of medication would be mailed to her address rather than his.[58] Ms. Atkins picked up Viagra for Uncle Leroy on several occasions between December 2009 and May 2010.[59] Supporting prescriptions were not found in his medical chart.[60]

Oscar Ard ("Oscar") is Ms. Atkins' brother.[61] Ms. Atkins picked up Viagra for Oscar on several occasions between December 2009 and May 2010.[62] Supporting prescriptions were not found in his medical chart.[63]

Mr. Porter went to school with Ms. Atkins.[64] She states that he asked her to pick up his medication.[65] Ms. Atkins picked up Viagra for Mr. Porter on several occasions between December 2009 and May 2010.[66] Supporting prescriptions were not found in his medical chart.[67]

Notably, none of these individuals had any medication even logged in to the Greensburg clinic during 2009 until December of that year.[68] Such medication deliveries would have given

---

[53] Ex. 1, *Atkins Depo.,* p. 102,
[54] Ex. 3, *Whittaker Affidavit,* SCHS 421-422.
[55] Ex. 1, *Atkins Depo.,* p. 102.
[56] Ex. 1, Atkins Depo., pp. 147-148 & Exhibit 21 thereto.
[57] Ex. 1, Atkins Depo., p. 148.
[58] Ex. 1, Atkins Depo., p. 98.
[59] Ex. 1, *Atkins Depo.,* pp. 102, 121, 125.
[60] Ex. 3, *Whittaker Affidavit,* SCHS 421-422.
[61] Ex. 1, *Atkins Depo.,* p. 97.
[62] Ex. 1, *Atkins Depo.,* pp. 119-120, 125.
[63] Ex. 3, *Whittaker Affidavit,* SCHS 421-422.
[64] Ex. 1, *Atkins Depo.,* p. 103.
[65] *Id.*
[66] Ex. 1, *Atkins Depo.,* pp. 102, 122, 131.
[67] Ex. 3, *Whittaker Affidavit,* SCHS 421-422.
[68] Ex. 2, *LeBlanc Depo.,* p. 67 & Exhibit 11 thereto.

first to the employee working the front desk at Greensburg – Ms. Atkins' former position.[69] The front desk employees should have then taken any such medication to the nurses' station, to be opened and logged in by the nurses.[70] Thus, a front desk employee looking for a particular package would have had the opportunity to remove it entirely before it was logged in.

Ms. LeBlanc reviewed all of the above information in the logs as part of the investigation.[71] She supplied that information to Ms. Senegal.[72]

Also as part of the investigation, SCHS employees reported that Ms. Atkins had been observed at the school-based clinic calling in prescriptions to PAP assistance over the telephone.[73] Ms. Atkins was not a nurse or any kind of clinical employee.[74] A provider asking a non-clinical employee to call in a prescription such as this would not have been typical at SCHS.[75] A non-clinical employee of a school-based clinic calling in medication on behalf of a patient at another clinic entirely would "absolutely" have not been the typical practice at SCHS.[76]

Nevertheless, Ms. Atkins insisted at deposition – incredibly – that she was requested to do so by various providers.[77] She further testified that she would obtain "verbal" authorization from the provider for what was essentially a prescription refill, and with no paper at all, would call such refills in to the PAP.[78] Ms. LeBlanc's investigation, however, did not uncover any provider who had asked Ms. Atkins to continue to assist with the PAP from the school-based clinic, nor did it uncover any provider who had authorized her, a non-clinical employee, to call in

---

[69] Ex. 1, *Atkins Depo.,* pp. 98-99, 100, 101.
[70] Ex. 1, *Atkins Depo.,* p. 101.
[71] Ex. 2, *LeBlanc Depo.,* p. 66 & Exhibit 11 thereto.
[72] Ex. 2, *LeBlanc Depo.,* pp. 66 – 72.
[73] Ex. 2, *LeBlanc Depo.,* pp. 73-74 & Exhibit 12 thereto.
[74] Ex. 2, *LeBlanc Depo.,* p. 74.
[75] Ex. 2, *LeBlanc Depo.,* p. 74.
[76] Ex. 2, *LeBlanc Depo.,* pp. 74-75.
[77] Ex. 1, *Atkins Depo.,* pp. 27-30.

prescriptions.[79]

Ms. LeBlanc also supplied Ms. Senegal with a copy of Ms. Atkins' personnel file, which contained her previous disciplinary record and termination for abuse of the PAP.[80]

Based on the overwhelming information as outlined above, Dr. Joseph Freeman ("Dr. Freeman"), the Medical Director at the time, recommended that Ms. Senegal terminate Ms. Atkins.[81] Ms. Senegal accepted Dr. Freeman's recommendation, and terminated Ms. Atkins' employment based on the same.[82] Ms. Atkins' EEOC Charge or prior complaints of discrimination were not discussed as any part of the investigation or termination, to Ms. LeBlanc's knowledge.[83]

Following Ms. Atkins' termination, she protested the same in an appeal of her unemployment benefits claim.[84] Attached to the letter, Ms. Atkins produced blanked-out prescription applications and prescriptions, purporting to bear the signature of Tammy Smith ("Ms. Smith"), a Nurse Practitioner and SCHS provider.[85]

During a deposition conducted on the last day of the discovery period, Ms. Atkins' counsel additionally produced, for the first time, several prescription assistance applications.[86] Each was dated the same day – May 12, 2010 – and purported to have been signed by Ms. Smith.[87] Each was for Viagra, on behalf of Oscar, Mr. Porter, and Mr. Flowers.[88] On Mr. Porter's application, Ms. Atkins listed what appeared to be her personal email address

---

[78] *Id.*
[79] Ex. 2, *LeBlanc Depo.,* p. 75.
[80] Ex. 2, *LeBlanc Depo.,* pp. 75, 76-78 & Exhibits 13 & 14 thereto.
[81] Ex. 4, *Freeman Affidavit,* SCHS 435; Ex. 5, *Senegal Affidavit,* SCHS 331.
[82] Ex. 5, *Senegal Affidavit,* SCHS 331; Ex. 2, *LeBlanc Depo.,* .
[83] Ex. 2, *LeBlanc Depo.,* p. 56.
[84] Ex. 1, *Atkins Depo.,* p. 63 & Ex. 11 thereto.
[85] *Id.*
[86] Ex. 6, *Smith Depo.,* pp. 8-9 & Exhibit 2 thereto.
[87] Ex. 6, *Smith Depo.,* Exhibit 2 thereto.
[88] Ex. 6, *Smith Depo.,* Exhibit 2 thereto.

9

(gwenard@hotmail.com) as Ms. Smith's professional provider email address – even though both Ms. Smith and Ms. Atkins had email addresses at SCHS at the time.[89]

## III.  ARGUMENT

### A. *Summary Judgment Standard*

Summary judgment is proper when the moving party, in a properly supported motion, demonstrates that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law.[90] If the moving party carries its burden under Rule 56(c), the opposing party must direct the court's attention to specific evidence in the record which demonstrates that it can satisfy a reasonable jury that it is entitled to verdict in its favor.[91] This burden is not satisfied by some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions or only a scintilla of evidence.[92]

In resolving the motion, the court must review all the evidence and the record taken as a whole in the light most favorable to the party opposing the motion, and draw all reasonable inferences in that party's favor.[93] The court may not make credibility findings, weigh the evidence, or resolve factual disputes.[94] When a party moves for summary judgment on an issue for which it bears the burden of proof at trial, it must demonstrate the absence of a fact issue as to that issue.[95]

---

[89] Ex. 6, *Smith Depo.,* pp. 16-17 & Exhibit 2 thereto.
[90] FRCP 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510 (1986); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir.1996), citing *Topalian v. Ehrman,* 954 F.2d 1125, 1131–31 (5th Cir.1992), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992) (internal citations omitted).
[91] *Anderson*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512.
[92] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)(*en banc*); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir.2005).
[93] *Anderson*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513.
[94] *Id.*; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000).

### B. *Plaintiff Cannot Establish Her Prima Facie Case as to the Claim of Retaliation in Termination.*

A plaintiff establishes a prima facie case for unlawful retaliation under Title VII by proving that: (1) he or she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and, (3) a causal connection exists between the protected activity and the adverse employment action.[96] Close timing between an employee's protected activity and an adverse action against the employee is the type of evidence which may provide the causal connection needed to make out a prima facie case of retaliation.[97]

Here, the Parties agree that Plaintiff filed an EEOC Charge, a protected activity, and that her employment was terminated, an adverse employment action. Plaintiff, however, offers absolutely no evidence of a causal connection between the two. There is no close timing between the two events at all; Plaintiff concedes that SCHS was at least aware of her second EEOC Charge by July 2009, nearly a year prior to her termination in May 2010. Although not conclusive, the timing of an employer's actions can be a significant factor in the court's analysis of a retaliation claim.[98] Clearly, the timing in this case suggests that the two events are entirely unrelated.

Indeed, in response to prior complaints of discrimination and unfairness, SCHS had actually reinstated Ms. Atkins from a prior termination, offered her back pay and a raise, and offered her still another raise after her reinstatement and subsequent pay complaints. None of these occurrences suggest any animosity or retaliatory intent on SCHS's part; in fact, they demonstrate the opposite – that SCHS listened and responded to Ms. Atkins' complaints of

---

[95] *Lindsey v. Sears Roebuck & Co.,* 16 F.3d 616, 618 (5th Cir.1994).
[96] *LeMaire v. State of Louisiana*, 480 F.3d 383, 388 (5th Cir. 2007).
[97] *McCoy v. City of Shreveport*, 492 F.3d 551, 562, n. 28 (5th Cir.2007); *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 (5th Cir.1997); see also *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir.1992).
[98] *Shirley*, 970 F.2d 39, 44 (5th Cir.1992).

discrimination.

Further, there is no evidence that there was even any discussion regarding Ms. Atkins' Charge filing by the SCHS employees then conducting the investigation. The only evidence in the record, offered by Ms. LeBlanc, is that there was no discussion at all regarding the Charge during the investigation. Plaintiff therefore cannot establish her prima facie case, and her Title VII claim is due to be dismissed on that basis.

### C. SCHS Has Asserted a Legitimate Nondiscriminatory Reason for Ms. Atkins' Termination, Which She Cannot Rebut.

Even if Ms. Atkins could establish her prima facie case, however, SCHS would still be entitled to summary judgment on the Title VII claim. Once the plaintiff establishes a prima facie case, the burden shifts onto the defendant to assert a nonretaliatory, legitimate reason for the termination.[99] Here, SCHS has articulated a clear and strong reason for Ms. Atkins' termination: the overwhelming indications that she submitted prescriptions to the PAP without appropriately documented prescriptions and provider approvals, almost always for Viagra, a high value drug, and almost always on behalf of friends and family members. None of the friends or family members had appropriately documented prescriptions, and not a single provider supported Ms. Atkins' claims of verbal authorizations for the undocumented prescriptions. Further, Ms. Atkins seemingly intercepted the prescriptions altogether during her employment at the Greensburg clinic, as no mentions of Viagra appear on the medication log during that time period. She picked them up herself, signing her own initials, after her reassignment to the school-based clinic.

In subsequently provided documentation, Ms. Atkins further illuminated her methods: she was in possession of blanked-out prescriptions and prescription applications, which she could have easily filled in as needed for prescriptions and then submitted to the PAP. She

---

[99] *Shirley*, 970 F.2d 39, 44.

additionally produced applications in which she listed her personal email address as the contact information for Ms. Smith, a Nurse Practitioner who was supposedly providing the authorization for the prescriptions.

If the defendant meets his burden, then the inference against the defendant dissolves, and the plaintiff must show that the given reason is a pretext for unlawful discrimination.[100] Aside from her claims of verbal authorization, Ms. Atkins offers no justification whatsoever for her actions, and no evidence at all in rebuttal of SCHS's legitimate nondiscriminatory reason for her termination. SCHS is entitled to summary judgment on her claims for this reason.

### D. SCHS Is Entitled to Dismissal of Ms. Atkins' Remaining Claims on the Same Basis as Dr. Freeman.

On April 15, 2015, Ms. Atkins filed her First Amended Complaint, this time adding two additional counts – Count Two, alleging malicious prosecution in the criminal matter filed in 2011 and dismissed in 2013, and Count Three, alleging defamation based on statements allegedly made in 2010 by former SCHS employees Ms. Senegal and Dr. Freeman. Plaintiff's First Amended Complaint additionally added Ms. Senegal and Dr. Freeman as Defendants for the first time.

#### 1. Count 2 of the First Amended Complaint Should Be Dismissed as Time-Barred.

In her malicious prosecution count, Plaintiff alleges that she was maliciously prosecuted by SCHS based on the criminal action filed against her on April 11, 2011.[101] By Plaintiff's own admission, all criminal charges against her were dismissed on March 4, 2013, the day her criminal trial was scheduled to begin.[102]

Based on Plaintiff's allegations, her claim for malicious prosecution has prescribed on its

---

[100] *McDonnell-Douglas,* at 804, 93 S.Ct. 1817.
[101] Doc. 38, *First Amended Complaint,* ¶ 23.
[102] Doc. 38, *First Amended Complaint,* ¶ 26.

13

face. Malicious prosecution actions are delictual claims, and thus are subject to a one-year prescriptive period.[103] Under Louisiana law, a claim for malicious prosecution arises upon the dismissal of the criminal matter.[104] Here, it is undisputed that the underlying criminal matter was dismissed on March 4, 2013, over two years before Plaintiff first alleged malicious prosecution against any defendant on April 5, 2015.

### 2. *Count 3 of the Second Amended Complaint Should Also Be Dismissed as Time-Barred.*

In her newly added defamation count, Plaintiff alleges that the statements of Dr. Freeman to the police additionally constitute defamation, in that they accused Plaintiff of a crime.[105]

Based on the dates as alleged by Plaintiff, however, Plaintiff's defamation claim has clearly prescribed. It is well settled that claims for defamation are delictual in nature, and are therefore subject to a one-year prescriptive period in Louisiana.[106] The Plaintiff's knowledge of the damage-causing publication is required in order for prescription to commence.[107] Prescription thereafter begins to run from the date the injury is inflicted, if immediately apparent to the victim, even though the extent of the damages may not be known.[108]

Here, Plaintiff states that she was first arrested – and therefore first had knowledge of any alleged defamation – on February 8, 2011.[109] Her prescriptive period for any defamation claims arising from those charges clearly therefore began to run on that date, and her right extinguished on February 8, 2012, over <u>three years</u> before she first brought the defamation claim. Further, the Court has previously dismissed Counts 2 and 3 as to Dr. Freeman, based on the arguments of

---

[103] La. C. C. art. 3492.
[104] *Murray v. Town of Mansura,* 2006-355 (La. App. 3 Cir. 9/27/06); 940 So. 2d 832, 838, citing *Manuel v. Deshotels*, 160 La. 652, 107 So. 478 (1926) and *DeBouchel v. Koss Const. Co.*, 177 La. 841, 149 So. 496 (1933).
[105] Doc. 38, *First Amended Complaint*, ¶ 45.
[106] See La. C.C.. art. 3492; *Wiggins v. Creary*, 475 So.2d 780, 781 (La. App. 1st Cir.), *writ denied,* 478 So.2d 910 (La. 1985); *Clark v. Wilcox,* 928 So.2d 104, 112 (La. App. 1st Cir. 2005).
[107] *Clark,* 928 So. 2d 104, 112, citing *Rice v. Felterman,* 814 So.2d 696, 699 (La. App. 1st Cir. 2002).
[108] *Clark,* 928 So. 2d 104, 112, citing *Wiggins,* 475 So.2d 780, 781.
[109] Doc. 38, *First Amended Complaint*, ¶ 22.

14

prescription herein.[110]

## IV. CONCLUSION

For these reasons, SCHS respectfully requests that its Motion for Summary Judgment be granted, and that Plaintiff's claims be dismissed with prejudice.

| **CERTIFICATE OF SERVICE** | Respectfully submitted by: |
|---|---|
| I certify that on this 31st day of October, 2016, a copy of the above and foregoing *Memorandum in Support of Motion for Summary Judgment* was filed with the clerk of court using the CM/ECF system. Notice of this filing will be served upon all parties by operation of the Court's electronic filing system. | **PERAGINE LAW FIRM, L.L.C.**<br><br>    */s/ Christa H. Forrester*    <br>Alex J. Peragine (La. Bar No. 19097)<br>Christa Hayes Forrester (La. Bar No. 33133)<br>527 East Boston Street, Suite 201<br>Covington, Louisiana 70433<br>Telephone: (985) 292-3500<br>Telecopy:  (985) 292-3501<br>E-mail: alex@plalaw.com<br>            christie@plalaw.com |
|     */s/ Christa H. Forrester*    <br>Christa H. Forrester, Esq | Counsel for *Defendant,*<br>*Southeast Community Health Systems* |

---

[110] Doc. 68.